John Thinnes, appellant, v. Kearney Packing Company, a partnership, et al., appellees.

112 N. W. 2d 732

Filed January 5, 1962.  No. 35081.

*Munro, Parker & Munro,* for appellant.

*Nye & Wolf, Maupin, Dent, Kay & Satterfield, Thomas O. David,* and *Clinton J. Gatz,* for appellees.

Heard before Simmons, C. J., Carter, Messmore, Yeager, Spencer, Boslaugh, and Brower, JJ.

Boslaugh, J.

This is a proceeding under the Nebraska Workmen's Compensation Act.  John Thinnes, the plaintiff and

appellant, was injured while working as a slaughterer and butcher for the Kearney Packing Company, the defendant and appellee. The defendant's insurance carrier was also joined as a party.

After a hearing before a single judge of the compensation court the plaintiff was awarded compensation for temporary total disability for 59 weeks at the maximum rate; medical, hospital, and traveling expenses in the amount of $614.95; and compensation at the rate of $7.09 per week for 241 weeks for 15 percent permanent partial disability to the body as a whole.

The plaintiff refused to accept the award and filed an application for a rehearing before the full compensation court. The full compensation court, after trial de novo, awarded the plaintiff compensation for temporary total disability for 59 weeks at the maximum rate; medical, hospital, and traveling expenses in the sum of $977.30; and compensation at the rate of $6.26 per week for 241 weeks for 15 percent permanent partial disability to the plaintiff's body as a whole, as a result of partial disability to his back.

The plaintiff refused to accept the award of the full compensation court and appealed to the district court which affirmed the award. From that judgment the plaintiff has appealed to this court.

An appeal to this court in a workmen's compensation case is considered and determined de novo upon the record. Klentz v. Transamerican Freight Lines, Inc., ante p. 53, 112 N. W. 2d 405.

The accident happened on July 29, 1959. The plaintiff was attempting to maneuver a beef animal into a chute where it would be killed. While the plaintiff was standing on a rail of a fence that led to the chute, one of the animals fell against his legs, pinning his feet down straight and dragging him along the fence toward a post. In an effort to free himself, the plaintiff grabbed hold of the fence and "gave all the strength I had to clear myself." At that time the plaintiff felt a sharp pain in

his right leg extending from his heel into his back.

Several days after the accident the plaintiff consulted Dr. Harold V. Smith, a physician. Dr. Smith made a diagnosis of a ruptured intervertebral disk and treated the plaintiff at his office for a week or 10 days with diathermy, analgesics, and rest. The plaintiff was then hospitalized and placed in traction for about 10 days.

In September 1959, the plaintiff was hospitalized at Hastings and examined by Dr. John G. Yost, an orthopedic surgeon. The plaintiff testified that at this time he had pain only in his lower back. Dr. Yost found that the plaintiff had a bad sprain of his low back with minimal signs of nerve irritation in the lower right extremity. X-ray and myelogram examination of the plaintiff by Dr. Yost disclosed no demonstrable evidence of a protruding or herniated lumbar disk but did disclose osteoarthritic changes in the plaintiff's spine.

The plaintiff was placed in traction, given continuous heat and medication, and gradually ambulated. He was then placed in a plaster cast and discharged from the hospital. Approximately 1 month later the cast was removed and a brace fitted. On November 10, 1959, Dr. Yost advised the plaintiff to try light work for half days.

Commencing in November 1959, the plaintiff complained to Dr. Yost of pain in his right arm. Later the pain spread to his shoulder and neck. In February 1960, the plaintiff was hospitalized at Hastings for about 9 days because of this difficulty.

In April 1960, the plaintiff was examined by Dr. Robert M. House, an orthopedic surgeon. X-ray examination of the plaintiff's cervical and lumbosacral spine disclosed a narrowing of the intervertebral disk spaces due to osteoarthritis. Dr. House concluded that the plaintiff had evidence of cervical nerve root irritation and a lumbar nerve root syndrome due to degenerative disk changes. Dr. House felt that the conservative treatment

of the lumbarsacral spine using a brace and exercise should be continued, and he performed a closed manipulation of the plaintiff's right shoulder under anesthesia at a hospital in Grand Island.

The controversy here is over the extent of the permanent disability of the plaintiff. The plaintiff contends that he is totally and permanently disabled. The defendant contends that the plaintiff's permanent disability does not exceed 15 percent and that the judgment of the district court should be affirmed.

For workmen's compensation purposes, total disability means disablement of an employee to earn wages in the same kind of work, or work of a similar nature, that he was trained for or accustomed to perform, or any other kind of work which a person of his mentality and attainments could do. A workman who, solely because of his injury, is unable to perform or to obtain any substantial amount of labor, either in his particular line of work, or in any other for which he would be fitted except for the injury, is totally disabled within the meaning of the Workmen's Compensation Act. Rapp v. Hale, 170 Neb. 620, 103 N. W. 2d 851.

The extent of the permanent disability which the plaintiff sustained as a result of the accident and injury on July 29, 1959, is a question of fact and can be determined only upon the basis of the record in this case.

The plaintiff is 59 years of age. He has a third grade education. He commenced farming when he was 22 years old and continued until 1937. He has worked on railroad section gangs and extra gangs and has done roofing and painting. He has worked for the defendant at the packing plant for about 14 years. At the time he was injured he was slaughtering and butchering cattle. This work, as done at defendant's plant, is hard manual labor which requires heavy lifting at times. There is other work at the plant such as boning, grinding, packaging, etc., which requires less physical effort and strength, but the defendant's business operation is such

that the employees are assigned to whatever work there is to be done at the time and some of it requires heavy lifting and strength.

According to Dr. Yost, when the plaintiff was examined on November 10, 1959, he was able to bend over and reach within 2 inches of the floor with his knees straight, and his straight-leg-raising sign was negative. The plaintiff stated that his pain was diminished, that he could walk 2 miles, and that he was able to drive from Kearney to Hastings by himself. Dr. Yost advised the plaintiff to increase his activities as he could tolerate and to try light work for half a day.

The plaintiff testified that in November he worked 5 hours 1 day helping feed cattle at the defendant's plant and that after that he felt very "tough" and stayed in bed for 4 days. The defendant's pay roll records show that in December 1959, plaintiff worked 12½ hours one week and 8 hours during another week. In November and December 1960, the plaintiff worked about 3 hours per day on 6 or 8 days at the defendant's plant. This work included trimming bones, helping cut up hogs, and sacking hams. The plaintiff testified that he did not continue to work for short periods of time because he could not stand it; that his back and neck pain him; and that the pain becomes greater when he stands for a long period of time and when he stoops over. The plaintiff also testified that he walks 2 or 3 miles every day; that he washes dishes for his wife, helps her clean ducks, sweeps the floor, and scrubs the basement; and that he looks after his horse, pumps water for it, and feeds it.

Dr. Yost testified that it was his opinion that the plaintiff could not return to work immediately and work 8 or 9 hours per day; that he could start on a gradual basis, performing light activities such as cutting and wrapping meat, making hamburger, and boning, and then work into other activities as his strength increased; that it is not unusual for a person to require from 3 weeks

to 3 months before he can work fully into the activities that he was doing before his injury; and that persons with low back injuries can and should learn to squat and lift with their knees.

There is definite conflict between the testimony of the plaintiff as to what he can do and the testimony of Dr. Yost as to what he thinks the plaintiff can do. It is clear that the compensation court accepted the testimony of Dr. Yost and rejected that of the plaintiff. In a workman's compensation case where the testimony is in irreconcilable conflict, this court will consider the fact that the trial court observed the demeanor of the witnesses and gave credence to the testimony of some rather than to the contradictory testimony of others. Chism v. Convair Mobile Homes, Inc., *ante* p. 86, 112 N. W. 2d 393.

The evidence establishes that the plaintiff is unable to do hard manual labor such as he has done at times in the past and such as he was doing at the time he was injured. The evidence also establishes that he is able to do some work including part of the work that he formerly did for the defendant. Disability is not to be measured solely by the occupation in which the workman was engaged at the time of the injury. Disability is not total if the workman who was injured is still capable of obtaining and performing remunerative employment. Micek v. Omaha Steel Works, 136 Neb. 843, 287 N. W. 645.

The evidence establishes that the plaintiff has some permanent disability as a result of the accident but it fails to show that he is permanently totally disabled. The evidence does not show that the earning power of the plaintiff was totally destroyed as a result of the accident on July 29, 1959.

Disability under subdivisions (1) and (2) of section 48-121, R. S. Supp., 1957, refers to loss of earning power rather than loss of bodily function. Losses in bodily function, so far as these subdivisions of the statute are

concerned, are important only as they relate to earning capacity. Miller v. Peterson, 165 Neb. 344, 85 N. W. 2d 700.

It is difficult to determine the extent of the permanent partial disability resulting from the accident in this case upon the evidence which is available to us. The record in this case does not contain any satisfactory direct evidence as to the permanent loss in earning power which the plaintiff has sustained. There is opinion evidence as to what his permanent losses in bodily functions are.

Dr. Yost testified that it was his opinion that the plaintiff had a permanent partial disability of the body as a whole of between 10 and 15 percent. This was based upon his finding as to range of motion, activity tolerance, muscle tightness of the hamstring muscles of his legs, and the weakness of grip in his right hand.

Dr. House testified that it was his opinion that the plaintiff had approximately 5 percent permanent partial impairment of the lumbarsacral spine, a 10 percent permanent partial impairment of the cervical spine, and a 3 percent impairment of the right shoulder.

It is significant that Dr. House made a lower estimate of disability of the lower back than of the cervical spine and shoulder. Dr. Yost did not relate the arm, shoulder, and neck difficulty which the plaintiff has to the accident on July 29, 1959. Dr. Yost testified that the plaintiff made no complaint about his neck, shoulder, and arm until 2 months after Dr. Yost first saw him, more than 3 months after the accident, and that the plaintiff stated these symptoms came on spontaneously. Dr. Yost further testified that in his opinion the neck, shoulder, and arm difficulty was the result of a reflex sympathetic dystrophy; and that it was the result of the stiff posture in which the plaintiff held himself and the rigid position in which he held his arm, together with the arthritic condition of his spine.

Dr. House testified that he thought the plaintiff had

been protecting his right arm because of pain and when the arm of an older person is protected for any length of time, there is a tendency for adhesions to form about the shoulder joint and result in a limitation of motion. Dr. House further testified that in his opinion the accident was the direct cause of the lumbar nerve root syndrome, but with respect to the neck, shoulder, and arm condition he would only state that the accident could cause that condition.

Upon consideration of all of the evidence in this case, we conclude that the plaintiff sustained a 35 percent loss in earning power as a result of the accident which occurred on July 29, 1959. This finding is based upon all of the factors which enter into earning power and is not limited to the evidence relating to loss of bodily functions.

The judgment of the district court should be modified to provide that the defendant and its insurance carrier shall pay to the plaintiff as compensation for permanent partial disability the sum of $14.61 per week for 241 weeks from September 15, 1960. As so modified, the judgment of the district court is affirmed.

AFFIRMED AS MODIFIED.